Sharon SANTARELLI and Alan
Santarelli, her husband,
Plaintiffs,

v.

BP AMERICA, Aqua Star, Price Chopper Supermarkets, a Golub Corporation Company, Golub Corporation, Bay State Lobster Co., Inc. and Heritage Salmon Company, Inc., Defendants.

No. 4:CV–93–1950.

United States District Court,
M.D. Pennsylvania.

Jan. 18, 1996.

Carl N. Frank, Farrell, Frank & Mattern, Wilkes–Barre, PA, for plaintiffs.

Jeffrey B. McCarron, Swartz, Campbell & Detweiler, Philadelphia, PA, for defendants BP America, Inc. and Aqua Star, Inc.

James A. Doherty, Jr., Scanlon, Howley, Scanlon & Doherty, Scranton, PA, for defendant Price Chopper Supermarkets, a Golub Corporation Company, Golub Corporation.

James P. Harris, III, Harris & Van Jura, Wilkes–Barre, PA, for defendant Bay State Lobster Company.

Timothy J. Holland, O'Malley & Harris, P.C., Wilkes–Barre, PA, for defendant Heritage Salmon Co., Inc.

### MEMORANDUM

McCLURE, District Judge.

**BACKGROUND:**

Plaintiffs Sharon and Alan Santarelli filed this products liability action to recover for injuries sustained by Sharon Santarelli as the alleged result of ingesting a toxin or toxins contained in salmon. Sharon Santarelli purchased one-half of a salmon from her local Price Chopper supermarket in Wilkes–Barre, Pennsylvania on January 18, 1992.

She prepared and ate a portion of the salmon the following day. Plaintiff was the only member of her family who ate the salmon. Within hours of consuming it, she experienced a series of bizarre and unnerving symptoms ranging from stomach problems to neurological problems. Plaintiff experienced nausea, diarrhea, abdominal pain, hyperventilation, increased heart rate, tooth pain, a strange metallic taste in her mouth, numbness in her extremities, sensations of extreme cold and dysesthesia. Alarmed by her symptoms, plaintiff went to the emergency room at Nesbitt Memorial Hospital (Nesbitt Memorial). Plaintiff was diagnosed as suffering from bronchitis and placed on Ceclor.

Her condition did not improve. She was seen on January 22, 1992 by her family physician, Frank C. Olshemski, M.D.[1] Plaintiff reported that her symptoms had not abated and had, if anything, worsened and multiplied. In addition to the symptoms reported previously at the emergency room, plaintiff reported experiencing intermittent prickling sensations and difficulty swallowing or consuming any food. Dr. Olshemski ordered a series of diagnostic tests.

Plaintiff was admitted to Nesbitt Memorial the following day. Plaintiff remained hospitalized until January 26, 1992. Thereafter, she continued to receive follow-up care from Dr. Olshemski. Plaintiff's symptoms continued essentially unabated and continued to elude a definitive diagnosis. Batteries of tests excluded a number of possibilities but gave no possible or probable explanation for plaintiff's severe, debilitating and strange constellation of symptoms.

Concern about plaintiff and the elusiveness of any explanation for her symptoms, other than their apparent link to her ingestion of the salmon on January 19, 1992, prompted plaintiff's relatives to contact Mark J. DiNubile, M.D.,[2] a specialist in infectious diseases. Dr. DiNubile's suspicion, later confirmed by plaintiff's family physician, was that she suffered from the ingestion of ciguatera or other marine toxins.

Ciguatera is a natural component of tropical algae which bioaccumulates up the food chain. Poisoning from its ingestion has long been a problem in tropical climates. Ciguatera poisoning has historically been associated with the consumption of tropic or reef-dwelling fish.[3] It has typically not been associated with the consumption of cold-water-dwelling fish, such as salmon, because the toxin is not naturally occurring in cold waters. Plaintiff's case is thought to be unique in that she apparently contracted the illness after consuming salmon, a fish not normally associ-

---

1. Dr. Olshemski's report dated April 22, 1993 is attached to record document no. 41 as exhibit "A".

2. Dr. DiNubile's reports dated March 2, 1993 and February 2, 1994 are attached to record document no. 41 as exhibits "B" and "C".

3. For a discussion of the properties and problems associated with the ciguatera toxin, see the articles reproduced at record document no. 41, exhibit "E".

ated with ciguatera poisoning. The posited explanation for the existence of the toxin in a species from a region not normally associated with it is based on the fact that the salmon consumed by plaintiff was farm-raised. Plaintiffs theorize that the farm-raised salmon was kept in proximity to fish from the tropics and the toxin was somehow transmitted from or through them.

There is no known antidote or cure for ciguatera poisoning. Symptoms typically abate after a period of six months but can last longer. Plaintiff continued to experience serious neurological problems for years after allegedly ingesting the toxin.

Plaintiff filed this action against Price Chopper Supermarkets; Golub Corporation (the parent corporation of Price Chopper); and against the three seafood suppliers of Price Chopper identified as potentially responsible for supplying the salmon purchased by the plaintiff: Aqua Star, Bay State Lobster Co., Inc. (Bay State), and Heritage Salmon Company, Inc. (Heritage). BP America (BP) was also named as a defendant, due to its corporate affiliation with Aqua Star.

Plaintiff alleges claims of negligence, breach of warranty and strict liability (Counts I, II and III, respectively) against all defendants. Plaintiffs also assert a claim under the Magnuson–Moss Warranty Federal Trade Commission Improvement Act, 15 U.S.C. § 2301 *et seq.* (Count IV) against all defendants. Alan Santarelli asserts a claim for loss of consortium (Count V).

Defendants move jointly for summary judgment in their favor. For the reasons which follow, we will enter an order granting the motions of Aqua Star, BP, Heritage and Bay State. The motions of Price Chopper and Golub for summary judgment as to Counts II, III and V will be denied. Judgment will, however, be entered in favor of all defendants as to Counts I and IV.

## DISCUSSION

### Summary judgment standard

Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c)

> ... [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is 'entitled to judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

*Celotex v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

The moving party bears the initial responsibility of stating the basis for its motions and identifying those portions the record which demonstrate the absence of a genuine issue of material fact. He or she can discharge that burden by "showing ... that there is an absence of evidence to support the nonmoving party's case." *Celotex, supra,* 477 U.S. at 323 and 325, 106 S.Ct. at 2552–53, 2554.

Issues of fact are " 'genuine' only if a reasonable jury, considering the evidence presented, could find for the non-moving party." *Childers v. Joseph,* 842 F.2d 689, 693–94 (3d Cir.1988), citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). Material facts are those which will affect the outcome of the trial under governing law. *Anderson, supra,* 477 U.S. at 248, 106 S.Ct. at 2510. In determining whether an issue of material fact exists, the court must consider all evidence in the light most favorable to the non-moving party. *White v. Westinghouse Electric Company,* 862 F.2d 56, 59 (3d Cir.1988).

### Loss of remainder of the salmon

The salmon which plaintiff purchased was divided into seven segments. Plaintiff consumed two of the seven pieces of fish. After she became ill, she submitted two of the remaining segments to the Pennsylvania Department of Agriculture (the department) for testing.[4] The department tested only for spoilage. The results were negative. After testing the fish, the department discarded the samples provided to it.

Three segments remained. Those segments were sent to Dr. Yoshitsugi Hokama Ph.D. at the University of Hawaii to test for the presence of the ciguatera toxin. A test for the presence of the toxin had only recently been developed by Dr. Hokama. Prior to that time, ciguatera poisoning had been an intractable problem in the tropic regions because there was no way to test for the presence or absence of the toxin in fish.

The salmon samples sent to Dr. Hokama tested positive for the presence of the ciguatera toxin.[5] Dr. Hokama did not test the salmon to determine the species. The remainder of the fish was stored in a freezer at the University of Hawaii. A power outage on March 24, 1994 caused the freezer to shut down. As a result, the remainder of the fish spoiled and was discarded. All that remained in Dr. Hokama's possession were two lipid extracts.

The extracts were sent to defendants' expert, Dr. Daniel G. Baden, for testing and analysis. One of the extracts, defendants allege, was found by Dr. Baden to be spoiled and unsuitable for any testing. The remaining extract was tested for the presence of ciguatera toxin. Evidence of the toxin was found. Defendants maintain, however, that due to the minuteness of the sample provided, their expert was unable to determine the concentration of the toxins present, a key factor, they contend, in determining the probability that consumption of the salmon in the quantity consumed by plaintiff would cause illness in the average individual.

### Alleged inability to identify probable supplier

Defendants seek summary judgment on the basis of the destruction of the remaining fish portions on several grounds. They assert that the lack of samples for further testing by their expert deprives them of the opportunity to identify which of the three wholesale suppliers provided the fish sold by Price Chopper to the plaintiff. Defendants maintain that Dr. Baden could have tested that extract to identify the species of salmon and thereby determine which wholesaler was the supplier.

Price Chopper's documentation on shipments received from wholesale suppliers narrowed the search for the supplier to Aqua Star, Bay State and Heritage. (Record document no. 39, exhibit "D", deposition of M. Kennally at pp. 9–10, 38–41 and 158–61.) Defendants contend that without another sample of the fish to test it is impossible to narrow the search any further or to identify with any degree of certainty which of the three wholesalers supplied the salmon consumed by the plaintiff. They assert that if another sample were available, they could determine, through further testing, the species of the salmon, and from that information, ascertain which of the three wholesalers supplied the salmon consumed by Sharon Santarelli. (Record document no. 39, exhibit "D", deposition of M. Kennally at p. 177 and 180.)

Without identifying the species, defendants contend, it is impossible for plaintiff to establish liability on the part of all or any one of the three suppliers. Price Chopper argues that the same difficulty entitles it to summary judgment as well since it will be deprived of any right of indemnification if the culpable supplier cannot be identified.

■ We agree with a portion of defendants' argument. Without evidence further narrowing the search for the supplier, plaintiffs cannot establish liability against all or any one of the three wholesalers. The evidence is insufficient to establish that it is

---

4. See: record document no. 41, exhibit "H."

5. Dr. Hokama's reports dated January 24, 1994 and June 26, 1995 are attached to record document no. 41 as exhibits "D" and "E".

more likely than not that any one of the three, as opposed to any of the others, supplied the salmon consumed by Sharon Santarelli. Absent such evidence, plaintiffs cannot establish liability on the part of any of the three wholesalers.

■ Evidence linking the defendant to the product which allegedly injured the plaintiff is a necessary element of plaintiff's case. It makes no difference that plaintiff was not at fault in destroying or discarding evidence key to that determination. This is not a matter of sanctioning the party responsible for the spoliation of evidence. Cf. *Schmid v. Milwaukee Electric Tool Corp.*, 13 F.3d 76, 78 (3d Cir.1994) (discussing sanctions appropriate in event of spoliation of evidence) and *Schwartz v. Subaru of America, Inc.*, 851 F.Supp. 191 (E.D.Pa.1994) (same).

■ Rather, it is a question of whether the plaintiff can establish all elements necessary to make out a prima facie case. If the plaintiff cannot link each defendant to the product which allegedly caused her injury, she cannot prevail against that defendant. *City of Philadelphia v. Lead Industries Association, Inc.*, 994 F.2d 112, 123–29 (3d Cir. 1993) (applying Pennsylvania law).

After reviewing the development and current state of Pennsylvania products liability law, the Third Circuit concluded in *Philadelphia*, that Pennsylvania [6] has not adopted any version of a market share theory which would allow a products liability plaintiff to recover against one or more defendants engaged in manufacturing or marketing the type or class of product allegedly responsible for plaintiff's injuries. *Id.* at 123–27. See also: *Skipworth v. Lead Industries Assoc.*, 665 A.2d 1288 (Pa.Super.Ct.1995) and *Mellon v. Barre–National Drug Co.*, 431 Pa.Super. 175, 636 A.2d 187, 192 (1993).

The market share theory of liability derives from the decision of the California Supreme Court in *Sindell v. Abbott Laboratories*, 26 Cal.3d 588, 163 Cal.Rptr. 132, 607 P.2d 924 (1980), in which the plaintiff sued to recover for injuries sustained as the alleged

result of her mother's ingestion of Diethylstilbestrol (DES) during pregnancy. *Skipworth v. Lead Industries Assoc.*, 665 A.2d 1288 (Pa.Super.Ct.1995). The California Supreme Court held that the plaintiff need not identify the defendant that manufactured the DES ingested by her mother on the ground that all manufacturers of products identical to the one that harmed a plaintiff are liable to that plaintiff in proportion to their respective market share, regardless of which actually supplied the DES allegedly responsible for her injury.

■ Further, even if Pennsylvania followed one of these theories, liability still would not lie under the facts presented here. All of the theories, as commonly applied by other jurisdictions, apply only in situations in which all defendants in the group sued manufactured or marketed a defectively designed product. Under the theory that all such entities were equally at fault and each derived economic benefit from the sale of the defective product, the law imposes liability on each defendant in the group generally. "[T]ortious conduct by all defendants is the *sine qua non* of market share liability." *Philadelphia*, 994 F.2d at 125.

Here, the defect alleged is more akin to a manufacturing defect than a design defect. There are no allegations that all farm-raised salmon sold by the defendants were infected with ciguatera or other toxins. Rather, the allegation is that the particular salmon purchased and consumed by plaintiff contained such toxins. Thus, even if the market share theory or some variation thereof applied under Pennsylvania law, liability still would not attach. There are no allegations before us that all wholesalers or suppliers of farm-raised salmon exposed their consumers to ciguatera or other toxins.

■ Nor is the theory of alternative liability available to plaintiffs under Pennsylvania law. "Alternative liability holds all tortfeasors who are unable to exculpate themselves jointly and severally liable for the plaintiff's injury." *Id.* at 127. In *Snoparsky v. Baer*,

---

**6.** Pennsylvania products liability law governs, since the fish was purchased and consumed here. Further, plaintiffs are Pennsylvania residents,

and there is no relevant link to any other jurisdiction. *Griffith v. United Air Lines, Inc.*, 416 Pa. 1, 203 A.2d 796 (1964).

439 Pa. 140, 266 A.2d 707, 709 (1970), the Pennsylvania Supreme Court adopted the definition of alternative liability set forth in the *Restatement (Second) of Torts*, which provides:

> Where the conduct of two or more actors is tortious, and it is proved that harm has been caused to the plaintiff by only one of them, but there is uncertainty as to which one has caused it, the burden is upon each such actor to prove that he has not caused the harm.

*Id.* (quoting *Restatement (Second) of Torts,* § 433B(3) (1965)). The Third Circuit went on to note, however, that "[t]he Pennsylvania Supreme Court has approved alternative liability only when each defendant's tortious conduct was simultaneous and identical, and all potential tortfeasors were joined as defendants." Those parameters plainly do not apply here. The wholesale suppliers' conduct was neither simultaneous nor identical, nor is there any evidence implicating more than one wholesaler. See, e.g, *Skipworth,* 665 A.2d at 1292.

Nor can plaintiffs avail themselves of an enterprise liability theory. Enterprise liability derives from a holding by the United States District Court for the Eastern District of New York in *Hall v. E.I. DuPont De Nemours & Co.,* 345 F.Supp. 353, 376–78 (E.D.N.Y.1972). In that case, thirteen children injured by blasting caps sued six manufacturers of the caps and their trade association. Collectively, the six manufacturers produced virtually all blasting caps sold in this country. The district court denied defendants' motion to dismiss on causation grounds, holding that defendants may be subject to liability even if plaintiff's injury cannot be linked to a particular defendant if: 1) a limited number of suppliers or manufacturers supply such products and all are joined as defendants; 2) all defendants possessed joint knowledge of the risks inherent in the product and a joint capacity to reduce the risks; and 3) each delegated the responsibility to set safety standards to a trade association which failed to reduce the risks associated with use of the product. *Id.* at 378.

The Pennsylvania appellate courts have never adopted the enterprise theory of joint liability. *Philadelphia,* 994 F.2d at 129, citing *Burman v. Golay & Co.,* 420 Pa.Super. 209, 616 A.2d 657, 660 (1992).

We will, therefore, grant the motion for summary judgement filed by Aqua Star, Bay State, Heritage Salmon, and BP America (BP). Plaintiffs' claims against Price Chopper and its parent corporation, Golub, remain.

### Claims against Price Chopper

■ Plaintiffs' claims against Price Chopper and Golub are not subjected to the same defenses as the claims against the wholesalers. The seller of a defective product is liable for the harm caused by that product. Price Chopper apparently does not contest that plaintiff Sharon Santarelli purchased the salmon which she consumed from one of its stores. Plaintiffs have produced, as evidence of the same, a copy of the register receipt dated January 18, 1992 which reflects the purchase of salmon that date from Price Chopper's Wilkes–Barre store. (Record document no. 41, exhibit "G")

Price Chopper argues that it should be exempt from liability in this case because it will be deprived of a right of indemnification against the culpable supplier. That unfortunate circumstance does not entitle Price Chopper to exemption from its own liability as the seller of an allegedly defective product. It remains liable for such harm which its product may have caused to the plaintiffs even if it may be unable to obtain indemnification from its supplier.

Price Chopper's motion for summary judgment on that ground will, therefore, be denied.

### Concentration of toxins in the salmon

■ Price Chopper argues that it is entitled to summary judgment, because the evidence does not establish that the concentration of ciguatera toxin in the fish would have caused illness in the average consumer. Price Chopper asserts that plaintiff reacted because she was overly sensitive to minimal levels of toxin present in the salmon—levels which would not have caused a toxic reaction in the average consumer. Price Chopper

further asserts that destruction of the remaining salmon deprived it of the opportunity to perform more exhaustive testing on the levels of toxin present in the salmon.

Plaintiff has produced expert evidence to the contrary. Testing performed by Dr. Hokama confirmed the presence of ciguatera toxin in the salmon samples sent to him by the plaintiff. Dr. Hokama states in his report that the threshold concentration of ciguatera toxin necessary to cause a reaction varies from individual to individual. Threshold levels range between 32 and 230 ng of toxin. Dr. Hokama concluded that the concentrations found in the fish consumed by plaintiff exceeded the minimal threshold levels. Dr. Hokama stated in his report: "If patients ate 1 or more of the salmon pieces sent us, then he/she will most likely be ill as this will fall in the range of 32 to 230 ng of toxin." (Record document no. 39, exhibit "I", p. 2) The evidence adduced by plaintiffs on this issue is plainly sufficient to ward off summary judgment.

Price Chopper argues that the destruction of the remaining salmon samples deprived it of the opportunity to perform further testing to confirm or refute the concentration conclusions reached by Dr. Hokama. We disagree. Although defendant's argument has some merit in the sense that its expert would have had an opportunity to perform more extensive and exhaustive testing had the samples not been destroyed, Dr. Baden did test to determine concentration levels. (Record document no. 39, exhibit "E")

■ Here, unlike the identification issue which we discuss above, plaintiff has established a *prima facie* case, and it is a question of whether it would be unjust to allow them to proceed to trial because defendant was deprived of the opportunity to obtain countervailing facts due to the loss or destruction of evidence. This, we find, brings into play the spoliation of evidence analysis.

■ Under the Third Circuit's decision in *Schmid*, district courts have the authority to sanction a party who destroys or alters relevant evidence. Whether sanctions are appropriate and the level of sanctions warranted turns on the following:

1) the degree of fault of the party who altered or destroyed the evidence;

2) the degree of prejudice suffered by the opposing party; and

3) the degree of sanction necessary to avoid substantial unfairness to the opposing party and, if the offending party is seriously at fault, to deter such conduct by others in the future.

*Id.* at 79 (citations omitted). See also: *Baliotis v. McNeil*, 870 F.Supp. 1285 (M.D.Pa. 1994). "[D]ismissal of a complaint or preclusion of evidence regarding an allegedly defective product is an extreme sanction reserved only for those instances where an entire product or the allegedly defective portion of a product is lost, spoiled or destroyed." *Mensch v. Bic Corp.*, 1992 WL 236965 (E.D.Pa.1992).

Here, no fault attaches to the loss of the remaining salmon samples. The power outage was a random event over which plaintiff obviously had no control and could not reasonably have foreseen when she forwarded the remaining samples to Dr. Hokama for testing.

Because of the nature of the case, defendants are only minimally prejudiced by the inability to perform further testing on the salmon. The testing performed by Dr. Baden did give some indication of concentration levels. While it will almost always be the case that more testing may produce more extensive, more conclusive results, the fact that some testing was done by defendants' expert, giving them some independent, scientific basis for disagreeing with plaintiffs' position lessens the prejudice they have suffered.

Further, as we discuss below, we are convinced that plaintiffs can proceed on a malfunction theory under the facts of this case. That circumstance, as well as the existence of extensive medical records which have been subjected to defendants' independent analysis and review, further lessen the prejudice suffered by defendants due to the loss of the remaining samples.

Plaintiffs base their case on direct as well as circumstantial evidence. As direct evidence, they point to the fact that toxins were found to be present in the salmon samples.

Independent of that, they offer as circumstantial evidence the fact that Sharon Santarelli: 1) became extremely ill within a few hours, the normal incubation time for ingestion of ciguatera toxin, of consuming the salmon; 2) was the only member of her family to become ill and also the only member of her family who ate the salmon; and 3) experienced a bizarre set of symptoms markedly characteristic of ingestion of ciguatera toxin. This two-pronged approach broadens the avenues open to defendants in refuting the claims asserted. Compare: *DeWeese v. Anchor Hocking Consumer and Industrial Products Group*, 427 Pa.Super. 47, 628 A.2d 421, 424 (1993) ("[W]here the allegedly defective component is unique to the discarded product.... [plaintiff's] failure to preserve the shattered pitcher has precluded him from raising a genuine issue of material fact regarding the identity of its manufacturer and seller.") and *Lee v. Boyle–Midway Household Products*, 792 F.Supp. 1001, 1005 (W.D.Pa.1992).

With respect to defendants' argument that plaintiff experienced problems because she was unusually sensitive to the toxin and reacted to an amount which would not have affected the average individual, that argument alone does not exonerate defendants from liability under either a section 402A or breach of warranty theory of liability.

Price Chopper and Golub can, arguably, convincingly refute plaintiffs' evidence by attacking either her direct or circumstantial evidence to show, e.g. that something other than ingestion of the salmon was responsible for her illness or by demonstrating that plaintiff suffered the symptoms which she did because of an unusual or rare allergic reaction.

Under Comment j to section 402A of the *Restatement Second of Torts*, sellers have a duty to warn consumers of a product known to be dangerous to a substantial number of the population. Comment j provides: "Where ... the product contains an ingredient to which a substantial number of the population are allergic, and the ingredient is one whose danger is not generally known, or if known is one which the consumer would reasonably not expect to find in the product, the seller is required to give warning against it, if he has knowledge...." *Id.* Similar considerations apply to breach of warranty claim.

Here, defendants' evidence does not establish as a matter of law that plaintiff suffered the reaction which she did because of a rare or unusual susceptibility to ciguatera or other toxins which may have existed in the salmon. The scientific literature produced by both sides, suggests, in fact, exactly the opposite: that vast numbers of the population will suffer potentially serious, even life-threatening, illness if they ingest fish contaminated with ciguatera toxin.

**Malfunction theory**

Plaintiffs are also entitled to proceed on a theory of product malfunction under the doctrine recognized by the Pennsylvania Supreme Court in *Rogers v. Johnson & Johnson Products, Inc.*, 523 Pa. 176, 565 A.2d 751, 754 (1989). Under the malfunction theory, a jury may infer a product defect from evidence that the product malfunctioned and evidence eliminating abnormal use or any reasonable, secondary cause for the malfunction. Under this theory, plaintiff may recover without demonstrating the precise nature of the product defect. *Id.* at 754. The plaintiff bears the burden, under this theory, of "negating reasonable secondary causes for the accident which are fairly raised by the evidence." *Roselli v. General Electric Company*, 410 Pa.Super. 223, 599 A.2d 685, 688 (1991), *appeal granted*, 530 Pa. 645, 607 A.2d 255 (1992), *appeal discontinued* (Jan. 11, 1993). "Defendants do not have to prove the existence of secondary causes for the accident or ... abnormal use" of the product. *Id.* "Their burden is only to identify other possible non-defect oriented explanations." *Id.*

Plaintiff consumed the fish. She was the only member of her family who did so and she was the only one who became ill. Further, she became ill within one to two hours of consuming the fish, well within the reaction time generally associated with a reaction to ingestion of ciguatera toxin. Even more compelling, plaintiff's symptoms are, according to the reports of her medical experts, characteristic of those normally associated

with a reaction to ciguatera toxin. Such evidence is sufficient to negate any "reasonable secondary cause" for her illness and entitles her to proceed under the malfunction theory. See generally: *Troy v. Kampgrounds of America, Inc.*, 399 Pa.Super. 41, 581 A.2d 665 (1990). Compare: *Roselli* (Plaintiffs could not proceed under "malfunction theory," that product malfunction occurred in absence of normal use or reasonable secondary causes.).

### Magnuson–Moss Act

 Count IV of plaintiffs' complaint asserts a claim under the Magnuson–Moss Warranty Federal Trade Commission Improvement Act (the Act), 15 U.S.C. § 2301–2312. Plaintiffs do not brief the question of the viability of the claims asserted under the Magnuson–Moss Warranty Act. On that basis, we consider the issue waived and will grant the motion of all defendants for summary judgment as to Count IV. See Local Rule 7.6.

If we were to consider the issue on the merits, we would reach the same result. Section 2311(b) of the Act provides:

(b)(1) Nothing in this chapter shall invalidate or restrict any right or remedy of any consumer under State law or any other Federal law.

(2) Nothing in this chapter (other than sections 2308 and 2304(a)(2) and (4) of this title shall (A) affect the liability of, or impose liability on, any person for personal injury, or (B) supersede any provision of State law regarding consequential damages for injury to the person or other injury).

15 U.S.C. § 2311(b).

The Act does not create a private, independent cause of action for personal injuries which are otherwise state law claims for breach of warranty. *Boelens v. Redman Homes, Inc.*, 748 F.2d 1058, 1068 (5th Cir. 1984) and *Washington v. Otasco, Inc.*, 603 F.Supp. 1295 (D.Miss.1985).

### Negligence claim

 Plaintiffs' negligence claim, asserted in Count I of the complaint, remains to be considered. The record before us contains no evidence of negligence on the part of either Price Chopper or Golub in purchasing or reselling the salmon consumed by plaintiff. We will, on that basis, enter summary judgment as to both remaining defendants on Count I.

### ORDER

For the reasons stated in the accompanying memorandum, **IT IS ORDERED THAT:**

1. Defendants' joint motion for summary judgment (record document no. 39) is granted in part.

2. Judgment will be entered against plaintiffs and in favor of Aqua Star, Bay State Lobster Co., Inc. (Bay State) Heritage Salmon Company, Inc. (Heritage); and BP America (BP) on all counts asserted.

3. Judgment will be entered against plaintiffs and in favor of defendants Price Chopper Supermarkets (Price Chopper) and Golub Corporation (Golub) as to Counts I and IV.

4. The motion is denied as to defendants Price Chopper Supermarkets and Golub Corporation with respect to Counts II, III and V.

5. The entry of any final judgment will be deferred until the conclusion of the case.

6. A telephone conference call will be held on Tuesday, January 30, 1996, at 4:30 p.m. to discuss scheduling matters. Plaintiffs' counsel is responsible for initiating the conference call and for ensuring that all counsel are on the line before the Court is contacted. (Chambers telephone number is (717) 323–9772.)