636 A.2d 187

Edward J. MELLON, Administrator of the Estate of Deborah Mae Mellon, Deceased and Edward J. Mellon, in His own right and on Behalf of the Children Deborah Mae Mellon, Edward M. Mellon, A Minor and Sean M. Mellon, A Minor, Appellants,

v.

BARRE–NATIONAL DRUG CO., Bay Labs, Inc., Bell Pharmacal Corp., Halsey Drug Co., Inc., Carroll Chemical Co., Consolidated Midland Corp., Cumberland, Inc., Dixon–Shane, Inc., Humco Laboratory, Inc., Parmed Pharmaceuticals, Inc., Purepac Pharmaceutical Co., Rite Aid, Roxane Laboratories, Inc., Rugy Laboratories, Scherer Laboratories, Inc., Spencer–Mead, Inc., Veratex Corporation, Appellees.

Superior Court of Pennsylvania.

Argued Oct. 28, 1993.

Filed Dec. 30, 1993.

176

Michael B.L. Hepps, Philadelphia, for appellants.

Frank J. Eisenhart, Jr., York, for Roxane Laboratories, appellee.

James M. Marsh, George J. Murphy, Hecker Brown Sherry and Johnson, Philadelphia, for Barre-National Drug Co.

Before ROWLEY, President Judge and McEWEN and KELLY, JJ.

McEWEN, Judge:

Appellants, Edward Mellon and his children, Edward and Sean Mellon, instituted this products liability action by filing a twelve-count complaint seeking damages from the appellees, a group which appellants allege contains all known manufacturers of syrup of ipecac, a drug which the decedent, Deborah Mae Mellon, allegedly, as a result of an undiagnosed eating disorder known as bulemia, secretly and repeatedly ingested in an attempt to lose weight. Appellants contended that as a result of this misuse of syrup of ipecac by the decedent, the toxic component of syrup of ipecac, emetine, accumulated in her body and caused her death by cardio-respiratory arrest.

Appellants, Edward and Sean Mellon, the children of the decedent, were unable to rouse her from her bed on the morning of March 25, 1983. The boys called their father who, upon his arrival approximately forty minutes thereafter, summoned an ambulance. The decedent was subsequently pronounced dead by personnel at Lower Bucks Hospital at 8:30 a.m. that morning. An autopsy, performed under the auspices of the Bucks County Coroner's Office, did not reveal a cause of death and toxicological studies were performed on samples of decedent's blood, bile, eye fluids and stomach contents.[1] The results of these studies, which were received three months after the death of the decedent, revealed the presence of emetine in the decedent's blood, bile, and urine samples.

Dr. Frederic Rieders, the toxicologist, concluded that "in the absence of similarly or more competent causes, the findings provide a competent independent cause of death through emetine toxicity—probably from chronic use of ipecac syrup used as an emetic following meals to 'lose weight'."

1. Tissue samples requested by the toxicologist, which were not submitted for analysis, might have shown whether the presence of emetine in decedent's circulating fluids was the result of ingesting one dose of syrup of ipecac or numerous, repeated doses over a period of time.

Appellants filed a complaint in the court of common pleas alleging that they had named all manufacturers of syrup of ipecac as defendants in this action and should be permitted to proceed on a collective liability theory, subject to the production of expert testimony that, as a result of the decedent's bulemia, it was probable that she had purchased syrup of ipecac from a large number of drug stores so as to avoid suspicion or detection. Appellants contend that as a result of this secretive behavior, there is a fair probability that the decedent purchased ipecac from a large number of retailers produced by different manufacturers.[2]

Appellees filed a motion for summary judgment on March 3, 1987, contending that there was an insufficient basis, as a matter of law, upon which a jury could be permitted to find that the death of the decedent was, in fact, caused by ingestion of syrup of ipecac. Appellees also requested the entry of summary judgment due to the inability of the appellants to identify any manufacturer or distributor of the ipecac allegedly ingested by the decedent.

The eminent President Judge Isaac S. Garb, in granting, in part, the motion for summary judgment, held that there were:

material issues of fact with respect to the question of the cause of death. Certainly the testimony of Drs. Rosko and Rieders presents a sufficient factual basis upon which inferences may be drawn that the cause of death was the repeated ingestion of ipecac. The record adequately established that the warnings imprinted upon the containers did not necessarily communicate that danger to prospective users. Therefore, the motion for summary judgment on that basis will be denied.

The complaint purports to state nine separate causes of action as follows: Count 1. negligence; Count 2. strict liability; Count 3. misrepresentation; Count 4. lack of consent; Count 5. express warranty; Count 6. implied warran-

2. Appellants concede that no person ever observed the decedent purchase or ingest syrup of ipecac, that no container of ipecac or receipts for its purchase were ever found, and that the decedent never told anyone that she had ingested syrup of ipecac.

ty; Count 7. fraud; Count 8. violation of federal law, negligence *per se;* and Count 9. conspiracy.

To take these in reverse order, we are satisfied that the record totally fails to sustain a cause of action for civil conspiracy. To state a cause of action for civil conspiracy the complaint must allege and the facts must reveal that two or more persons combined or entered into an agreement to commit an unlawful act or to do an otherwise lawful act by unlawful means. *Slaybaugh v. Newman,* 330 Pa.Super. 216, 479 A.2d 517 (1984). Proof of malice is an essential part of a cause of action for conspiracy. *Thompson Coal Company v. Pike Coal Company,* 488 Pa. 198, 412 A.2d 466 (1979). The mere fact that two or more persons happen to do something which they have a right to do at the same time is not by itself an actionable conspiracy. *Thompson Coal Company v. Pike Company, Id.* and *Morris v. Halford,* 352 Pa. 138, 42 A.2d 411 (1945). On this record, there is no evidence whatsoever to reveal that any of the defendants acted in concert in any way or for any purpose. Therefore, summary judgment will be granted with respect to Count 9. With respect to Count 8, violation of a federal law, negligence *per se,* summary judgment will likewise be granted for all defendants. Under the federal decisions that have addressed this issue, it has uniformly been held that there are no private causes of action under the Food, Drug and Cosmetics Act, 21 U.S.C. §§ 301 *et seq. See Griffin v. O'Neal, Jones and Feldman, Inc.,* 604 F.Supp. 717 (S.D.Ohio 1985); *National Women's Health Network, Inc. v. A.H. Robins Co., Inc.,* 345 [545] F.Supp. 1177 (D.Mass. 1982); and *Keil v. Eli Lilly & Co.,* 490 F.Supp. 479 (E.D.Michigan 1980). As for an assertion of negligence *per se,* the record in this case reveals that the warnings imprinted upon the containers of ipecac conformed with all federal regulations. Therefore, there is no basis upon which a finding of negligence *per se* can be made.

With respect to Count 7, fraud, we likewise determine that summary judgment must be granted in favor of the defendants. It has uniformly been held that a very high standard

of proof is required to establish a fraud. The evidence in support of it must be clear, precise and indubitable. *See Gerfin v. Colonial Smelting and Refining, Inc.*, 374 Pa. 66, 97 A.2d 71 (1953) and *New York Life Insurance Company v. Brandwene*, 316 Pa. 218, 172 Atlantic 669 (1934). In order to establish a fraud there must be a showing by such evidence of a misrepresentation, a fraudulent utterance thereof with an intention by the maker that the recipient will be induced to act together with justifiable reliance by the recipient upon the misrepresentation and resulting damage. *See Newman [Neuman] v. Corn Exchange National Bank and Trust Company*, 356 Pa. 442, 51 A.2d 759 (1947) and *Eden Roc Country Club v. Mulhauser, [Mullhauser]* 416 Pa. 61, 204 A.2d 465 (1964). Clearly, this record is devoid of any such evidence.

Counts 6, implied warranty, and 5, express warranty, must likewise fall. With respect to express warranty, the complaint alleges that the warranties extended to the drug's use as an emetic were in some way false or misleading. However, the representations made on the containers regarding its use as an emetic for which it was sold, were accurate and not in any way false or misleading. There was no representation that they could be used for the purpose for which the decedent used them. Therefore, there is no evidence on this record to support the claim based upon express warranty.

The same is likewise true with respect to Count 6 alleging implied warranties of merchantability. This is a warranty which is implied by law that goods sold are reasonably fit for the general purpose for which they are sold. *Eimco Corp. v. Joseph Lombardi & Son*, 193 Pa.Super. 1, 162 A.2d 263 (1960). The flaw in plaintiff's case in this regard is found in the fact that there is no demonstration that ipecac was not fit for the purpose for which it was sold, as an antidote or response to oral poisoning. There is no representation of its utility for the purpose for which decedent used it nor is there any misleading statement regarding that

use. Therefore, summary judgment must likewise be granted with respect to Count 6.

Summary judgment will likewise be granted for the defendants with respect to Count 4, lack of consent. The doctrine of informed consent in Pennsylvania is limited in its application solely to those cases involving surgical or operative medical procedures. It is not extended to cases involving the administration of therapeutic drugs. *Boyer v. Smith,* 345 Pa.Super. 66, 497 A.2d 646 (1985).

Summary judgment will also be granted on Count 3, misrepresentation. Misrepresentation under the Restatement (Second) of Torts Section 402B, like fraud, requires a showing of justifiable reliance by plaintiff upon the alleged misrepresentations of the defendant. *See Klages v. General [Ordnance ] Ordnance Equipment Corp.,* 240 Pa.Super. 356, 367 A.2d 304 (1976); *Wickes Corp. v. Newtown Savings Association,* 322 Pa.Super. 453, 469 A.2d 1078 (1983), and *Klemow v. Time, Inc.,* 466 Pa. 189, 352 A.2d 12 (1976). Those elements are lacking in this case, there being no showing of any misrepresentation on the part of any manufacturers or distributors with respect to ipecac. Therefore, this count must likewise fall.

That leaves us with Count 1, which is common-law theory of negligence and Count 2 being strict liability in tort under the Restatement (Second) of Torts, Section 402A. In each of these instances, the defendants maintain that there can be no liability in Pennsylvania absent a showing of identification of a specific manufacturer or distributor of the specific substances ingested by the decedent. Plaintiffs advance three different theories upon which liability could be founded in Counts 1 and 2. Without belaboring these theories unduly, we believe it is sufficient to observe that they were all extensively analyzed in two recent cases of our Superior Court. *See Cummins v. Firestone Tire & Rubber Company,* 344 Pa.Super. 9, 495 A.2d 963 (1985), and *Burnside v. Abbott Laboratories,* 351 Pa.Super. 264, 505 A.2d 973 (1985). In each of these cases it is established that the concerted action theory does not apply to this case. That is a cause of

action arising under Section 876 of the Restatement (Second) of Torts. In order for this cause of action to be viable there must be acts of tortious character pursuant to a common design or plan. *See Cummins v. Firestone Tire & Rubber Company, supra.* Clearly there is no evidence in this case to reveal such a common scheme or plan nor is there any evidence to show that a defendant rendered substantial assistance to another to accomplish a tortious act.

Plaintiff likewise cannot succeed on the alternative liability theory. This theory of liability is founded upon Section 433B(3) of the Restatement (Second) of Torts which provides as follows:

> Where the conduct of two or more actors is tortious, and it is proved that harm has been caused to the plaintiff by only one of them, but there is uncertainty as to which one has caused it, the burden is upon each such actor to prove that he has not caused the harm.

This theory of liability was adopted in Pennsylvania by *Snoparsky v. Baer,* 439 Pa. 140, 266 A.2d 707 (1970), and *Sommers v. Hessler,* 227 Pa.Super. 41, 323 A.2d 17 (1974). Each of these cases and others where this theory has been applied, have determined that it can only be a basis for liability where there is a showing that there was group negligence on the part of several defendants but where it could not be established which of those defendants was personally responsible for the injuries incurred. As such, the theory would not apply in this case.

Industry-wide liability was enunciated by the United States District Court for the Eastern District of New York in *Hall v. E.I. DuPont DeNemours Company, Inc.,* 345 F.Supp. 353 (E.D.N.Y.1972). While admittedly that theory would apply to this case, it was specifically spurned as the law of Pennsylvania in *Cummins v. Firestone Tire & Rubber Co., Inc., supra.*

Lastly, plaintiffs seek recovery based upon market-share liability as enunciated in *Sindell v. Abbott Laboratories, et al.,* 26 Cal.3d 588 [163 Cal.Rptr. 132], 607 P.2d 924 (1980).

Although there are no Pennsylvania cases specifically holding that this is a theory of liability recognized and accepted in Pennsylvania, neither *Burnside v. Abbott Laboratories, supra,* nor *Cummins v. Firestone Tire & Rubber Co., Inc., supra,* nor any other case that we know of has to this date rejected it. Therefore, on this basis we will deny summary judgment *solely on this theory as applied to Counts 1 and 2 of the complaint.*

*Mellon v. Barre–National Drug Co.,* 53 Bucks Co.L.Rep. 23, 25–27 (1987) (emphasis supplied). Following the entry of summary judgment on Counts 3 through 9 of the complaint, discovery proceeded on the remaining theory of market share liability as set forth in counts one and two of the complaint. However, on January 21, 1993, appellees filed a motion for summary judgment, contending that market share liability had not been adopted in Pennsylvania. The trial court granted the motion and dismissed the complaint with prejudice. This timely appeal followed.

■ Our scope of review of an order granting summary judgment is plenary.

A grant of summary judgment is proper where the pleadings, depositions, answers to interrogatories, admissions of record and affidavits on file support the court's conclusion no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Pa.R.C.P. 1035. *See: Penn Center House, Inc. v. Hoffman,* 520 Pa. 171, 553 A.2d 900 (1989) (entire record before lower court must be examined and all doubts as to the existence of an issue of material fact are to be resolved against a grant of summary judgment). The trial court must accept as true all well-pleaded facts relevant to the issues in the non-moving party's pleadings, and give to him the benefit of all reasonable inferences to be drawn therefrom. *Jefferson v. State Farm Insurance Co.,* 380 Pa.Super. 167, 551 A.2d 283 (1988). We will overturn a trial court's entry of summary judgment only if there has been an error of law or a clear abuse of discretion. *McCain v. Pennbank,* 379 Pa.Super. 313, 549 A.2d 1311 (1988).

*Burman v. Golay & Co., Inc.,* 420 Pa.Super. 209, 212, 616 A.2d 657, 658 (1992), *allo. denied,* 533 Pa. 648, 624 A.2d 108 (1993). *Accord: Fiffick v. GAF Corp.,* 412 Pa.Super. 261, 262–265, 603 A.2d 208, 209–210 (1992); *Godlewski v. Pars Manufacturing Co.,* 408 Pa.Super. 425, 430–431, 597 A.2d 106, 109 (1991); *Eckenrod v. GAF Corp.,* 375 Pa.Super. 187, 190–191, 544 A.2d 50, 52 (1988), *allo. denied,* 520 Pa. 605, 553 A.2d 968 (1988).

The issue presented for determination by this Court is whether appellants may utilize the theory of market share liability in lieu of evidence identifying the manufacturer(s) and supplier(s) of the syrup of ipecac allegedly ingested by the decedent.

> The requisite elements of a cause of action in negligence are 1) a duty on the part of the defendant to conform to a certain standard of conduct with respect to the plaintiff, 2) a failure by the defendant to so conform, and 3) a reasonably close causal connection between the defendant's conduct and some resulting injury to the plaintiff. This last element is commonly known as proximate cause. . . .

*Cummins v. Firestone Tire and Rubber Co.,* 344 Pa.Super. 9, 16, 495 A.2d 963, 967 (1985).

 Proof of causation is a necessary element in a products liability action as well as in a negligence action. "A plaintiff must establish that a particular product of a defendant manufacturer caused her injuries." *City of Philadelphia v. Lead Industries Asso.,* 994 F.2d 112, 123 (3rd Cir.1993), *citing Lilley v. Johns–Manville,* 408 Pa.Super. 83, 92, 596 A.2d 203, 207 (1991), *allo. denied,* 530 Pa. 644, 607 A.2d 254 (1992); *Eckenrod v. GAF Corp.,* 375 Pa.Super. 187, 190–191, 544 A.2d 50, 52 (1988), *allo. denied,* 520 Pa. 605, 553 A.2d 968 (1988). In general, a defendant must be identified as the manufacturer, distributor, or seller of the offending product before the injuries suffered by the plaintiff may be found to be proximately caused by some negligent act or omission of the defendant. "Absent such identification, there can be no allegations of duty, breach of duty, or legal causation, and hence there can be no liability." *Id.,* 344 Pa.Super. at 18, 495 A.2d at 967–968.

Appellants contend that due to their inability to ascertain the identity of the manufacturers/distributors/retailers of the syrup of ipecac allegedly ingested by the decedent, they should be permitted to proceed utilizing market share liability in lieu of product identification evidence. We disagree.

Market share liability is a collective liability theory, developed by the California Supreme Court in a DES case, *Sindell v. Abbott Laboratories*, 26 Cal.3d 588, 163 Cal.Rptr. 132, 607 P.2d 924 (1980), *cert. denied*, 449 U.S. 912, 101 S.Ct. 285, 66 L.Ed.2d 140 (1980), pursuant to which manufacturers, who produce a fungible and thus unidentifiable product that causes injuries, are held liable to a plaintiff in proportion to their respective market shares:

> The Supreme Court of Pennsylvania has never embraced, rejected, or even discussed market share liability. The only Pennsylvania state court that has allowed a plaintiff to utilize market share liability instead of identifying the manufacturer who produced the defective, injury-causing product was a trial court. *See: Erlich v. Abbott Lab.*, 5 Phila. 249 (C.P.1981). *Erlich* also was a DES case. There, the Court of Common Pleas found that market share liability is appropriate when: (1) *all defendants are tortfeasors;* (2) the allegedly harmful products are identical and share the same defective qualities; (3) plaintiff is unable to identify which defendant caused her injury *through no fault of her own;* and (4) the manufacturers of substantially all of the defective products in the relevant area and during the relevant time are named as defendants.
>
> \* \* \* \* \* \*

Neither the Superior Court nor the Commonwealth Court, Pennsylvania's intermediate appellate courts, has permitted a plaintiff to proceed using the theory of market share liability.

 \* \* \* \* \* \*

After canvassing all relevant Pennsylvania law, we have found only a decade-old, trial court opinion that has permitted a plaintiff to proceed under a theory of market share

liability. This lone decision is insufficient to establish market share liability as a recognized exception to the proximate cause requirement under Pennsylvania law. Nor has there been a clear authoritative signal that the Pennsylvania Supreme Court would adopt market share liability. No nationwide consensus that market share liability should be embraced exists, as evidenced by the split of authority among the highest state courts that have addressed this issue.

*City of Philadelphia v. Lead Industries Asso.*, 994 F.2d 112, 124–125 (3rd Cir.1993) (footnotes omitted) (emphasis supplied).

 We agree with the conclusion of the trial court that the appellants in this case cannot meet their burden of proof by utilizing the market share liability theory in lieu of evidence of the use of a particular defendant's or defendants' products by the decedent, Mrs. Mellon. We reach this conclusion, as did the trial court, on the basis of the inability of the appellants to establish two elements which we believe were essential to the development by the *Sindell* Court of the theory of market share liability—an inability on the part of a plaintiff—*through no fault of his or her own*—to identify the product, and a substantial time lapse—such as that experienced by the children affected in utero by DES—between the use of the product and manifestation of the harm.[3]

As for the element of identification, distribution and labelling of syrup of ipecac is controlled by federal law and while the formula of all of the manufacturers is identical, the one ounce containers, which are available for purchase without prescription, are clearly marked with the name of the manu-

3. Due to our resolution of this issue, we do not reach the issue of whether market share liability should be adopted by Pennsylvania. However, as Judge Hester noted in *Cummins v. Firestone Tire and Rubber Co.*, *supra* at 24–25 n. 6, 495 A.2d at 971 n. 6:

" 'Extensive policy shifts of this magnitude should not be initiated by an intermediate appellate court. The appropriate tribunal to accomplish such drastic changes is either the Supreme Court or the Legislature.' *Namm v. Charles E. Frosst & Company*, 178 N.J.Super. 19, 35, 427 A.2d 1121, 1129 (1981)."

facturer and a warning that the drug is not to be used without first consulting a physician or poison control center.[4] The inability of the appellants in the instant case to identify the manufacturer of the ipecac allegedly ingested by the decedent was not caused in any way by the appellees but rather was solely a result of the decedent's conduct in purposefully and surreptitiously misusing the product. Thus, one of the essential elements of the *Sindell* analysis is missing.

4. The Code of Federal Regulations, 21 C.F.R. § 201.308, provides:

(a) It is estimated that each year about 500,000 accidental poisonings occur in the United States and result in approximately 1,500 deaths, of which over 400 are children. In the emergency treatment of these poisonings, ipecac syrup is considered the emetic of choice. *The immediate availability of this drug for use in such situations is critical, since rapid treatment may be the difference between life and death. The restriction of this drug to prescription sale limits its availability in emergencies.* On the other hand, it is the consensus of informed medical opinion that ipecac syrup should be used *only* under medical supervision in the emergency treatment of poisonings. In view of these facts, the question of whether ipecac syrup labeled as an emergency treatment for use in poisonings should be available over the counter has been *controversial.* (emphasis supplied).

(b) In connection with its study of this problem, the Food and Drug Administration has obtained the views of medical authorities. It is the unanimous recommendation of the American Academy of Pediatrics, the American Association of Poison Control Centers, the American Medical Association, and the Medical Advisory Board of the Food and Drug Administration that ipecac syrup in 1 fluid ounce containers be permitted to be sold without prescription so that it will be readily available in the household for emergency treatment of poisonings, under medical supervision, and that the drug be appropriately packaged and labeled for this purpose.

(c) In view of the above recommendations, the Commissioner of Food and Drugs has determined that it is in the interest of the public health for ipecac syrup to be available for sale without prescription, provided that it is packaged in a quantity of 1 fluid ounce (30 milliliters), and its label bears, in addition to other required label information, the following, in a prominent and conspicuous manner:

(1) A statement conspicuously boxed and in red letters, to the effect: "For emergency use to cause vomiting in poisoning. Before using, call physician, the Poison Control Center, or hospital emergency room immediately for advice."

(2) A warning to the effect: "Warning—Keep out of reach of children. Do not use in unconscious persons. Ordinarily, this drug should not be used if strychnine, corrosives such as alkalies (lye) and strong acids, or petroleum distillates such as kerosene, gasoline, coal oil, fuel oil, paint thinner, or cleaning fluid have been ingested."

(3) Usual dosage: 1 tablespoon (15 milliliters) in persons over 1 year of age.

A further element upon which the development of the market share liability theory was predicated is also absent: there is no substantial time lapse involved between ingestion of syrup of ipecac and manifestation of the effects of emetine poisoning. Thus it is that we are constrained to agree with the conclusion of the learned trial court that, even if market share liability had been adopted in this Commonwealth, application of the doctrine in this case would not be warranted. We, therefore, affirm the entry of summary judgment in favor of appellees.

Order affirmed.