## Sokoloski v. American Home Products

*Lee B. Belefsky,* for plaintiffs.

*J. Clayton Undercofler,* for defendant Les Servier.

*Michael T. Scott, Barbara R. Binis,* and *Reetu Dandora,* for defendants AHP and Wyeth Ayerst.

TERESHKO, *J.,* January 9, 2003—Plaintiffs, Judith and Joseph Sokoloski, now appeal this court's order dated November 14, 2001 granting the motion for summary judgment in favor of defendants, Les Laboratoires Servier and Servier Amerique (referred to collectively as Les Servier). Plaintiffs are one of 22 other plaintiffs against whom this order was entered. Pursuant to the order of the Superior Court (attached as exhibit A [not published herein]), these appeals are consolidated.

These actions were part of the diet drug Phentermine-Fenfluramine (Phen-Fen) mass tort litigation in Philadelphia, Pennsylvania. At the time of this litigation, this writer was the supervising judge of the Complex Litigation Center and, in that capacity, supervised the mass tort program.

The mass tort program included all the Phen-Fen cases against defendant American Home Products Corporation (AHP). At the time of the entry of the instant order, all the then-open cases against AHP were settled, leaving Les Servier as the only open defendant. In due course, these actions against Les Servier were on track to proceed to trial when, on May 21, 2001, Les Servier filed its global motion for summary judgment.

## FACTUAL HISTORY [1] AND LEGAL ANALYSIS

In what follows, the factual history and legal analysis of this litigation are considered together.

---

1. Since these facts are not contested in any material way, citation to the record is omitted.

In the early 1990s, a new diet drug was launched upon the American consumer. It consisted of using the drug fenfluramine in conjunction with the drug phentermine to create the now well-known "Phen-Fen" therapy. The use of phentermine is not at issue here. Rather, the fenfluramine component of Phen-Fen is our principal focus, as well as dexflenfluramine, its chemical "cousin," which subsequently was used as an alternative to phentermine.

For commercial purposes, fenfluramine had become the brand name "Pondimin" and dexfenfluramine had become the brand name "Redux."

Les Servier, a corporate citizen of France, with its principal place of business in France, manufactured the bulk powdered ingredient in both Pondimin and Redux and licensed the use of the active ingredient to various entities which ultimately joined the AHP corporate family.

Les Servier never established a corporate presence in the United States.

The powdered product that was licensed and sold to the AHP entities in the United States was converted by AHP into the final product of Phen-Fen. The U.S. Food and Drug Administration ( FDA) approved the final product for sale by AHP. The right to do this was sought by and granted to AHP as an exclusive right in the United States. There was no evidence to show that Les Servier ever sought or received from the FDA the right to sell the final product.

Since AHP entities were the sole licensees of Les Servier and had exclusive approval from the FDA, Les Servier argues that AHP was the sole manufacturer, distributor, marketer and promoter of Pondimin and Redux.

Against this background, a review that includes the federal diet drug litigation is now appropriate.[2]

After the medical complications attendant on the use of Pondimin and Redux became known, the Pondimin and Redux products were withdrawn from the U.S. market in a joint announcement made by AHP and the FDA on September 15, 1997.

An avalanche of litigation soon followed in state and federal courts. All the federal litigation was consolidated for pretrial purposes in the Eastern District of Pennsylvania, under the Multi District Litigation Rules (MDL). Because of the overlap of the state and federal cases, as well as of state and federal litigators, pretrial discovery and settlement negotiations were conducted as an ongoing joint exercise.

During the discovery and settlement processes, on October 12, 1999, a class action complaint was filed as *Brown v. American Home Products Corporation.* It is instructive to read Judge Bechtle's language in understanding the significance of this class action complaint.

"The *Brown* complaint was filed as a vehicle for combining the claims of class members asserted in pending federal and state diet drug litigation throughout the country into a single complaint to facilitate class action treatment of those claims for settlement purposes. (T.R. 5-2-00.) The settlement agreement was reached with respect to a class consisting of all persons in the United States who ingested Pondimin and Redux and their as-

---

2. See *In re Diet Drugs, Brown v. American Home Products Corp,* 2000 WL 1222042 (E.D. Pa.) (providing the source of these background facts).

sociated consortium claimants. (Exhibit P-3 at 19 of 48.)" *In re Diet Drugs, Brown v. AHP* at \*19.

The foregoing takes on significance because of what was required to establish and certify this class.

In *In re Diet Drugs, Brown v. AHP,* Judge Bechtle had before him the joint motion of the class representatives and the sole defendant, American Home Products, for an order certifying and approving the nationwide settlement class embodied in the settlement agreement entered into between the parties on November 19, 1999. *Id.*

In order to arrive at the point where approval of such motion would be proper, certain underlying requirements had first to be met.

Class requirements are stated generally under Rule 23 of the Federal Rules of Civil Procedure. Fed.R.C.P. 23 et seq. Specifically, Fed.R.C.P. 23 establishes the "commonality" requirement in 23(a)(2) while identifying four prerequisites to a class action:

"One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class."

In class counsel's proposed findings of fact and conclusion of law (appendix, tab. 2, exhibit "H") it was represented that, "Diet drugs themselves were essentially a single product, marketed by a single major manufacturer. . . ." *Id.* (Referring to AHP.)

In *In re Diet Drugs, Brown v. AHP,* under the commonality requirements, Judge Bechtle adopted the following facts proposed by plaintiffs.

"Here, there exist several common issues to the class to support a finding of predominance and cohesiveness. With regard to common questions of fact, the diet drugs at issue here are essentially a single product—in that Pondimin and Redux are chemically related—marketed by a single major manufacturer—AHP." *Id.* at *41.

"In addition, plaintiff's claims in this litigation all stem from allegations involving a common course of conduct followed by AHP. (internal citations omitted) Plaintiff's negligence and failure to warn claims will revolve around AHP's conduct and knowledge in developing and marketing Pondimin and Redux. Although there are some individual differences among class members, the common class-wide focus on AHP's knowledge and conduct predominate such that judicial efficiency will be improved through the class mechanism . . . ." *Id.* at *42.

"The instant class is more cohesive than the classes sought to be certified in the asbestos and tobacco litigation arenas." *Id.*

"[T]he instant class was exposed to only two diet drugs, which are chemically related, . . . ." *Id.*

"Where *Anchem* involved 20 asbestos defendants, the instant class involves a single manufacturer defendant—AHP." *Id.*

Here, it is thus clear that plaintiffs, for the purpose of obtaining class action certification and national settlement approval, advanced the position in the national diet drug litigation that AHP was the only manufacturer, dis-

tributor and promoter of the diet drugs in question. Further, it is likewise clear that the trial court in that litigation, vested with authority as the coordinating court under the Federal Rules for Multi District Litigation, entered as a conclusion of law the position advanced by plaintiff regarding AHP's status as the sole manufacturer, distributor and promoter.

Basing its determinations in the instant matter upon the doctrine of judicial estoppel, this court holds that plaintiff's actions in the class action litigation mentioned above necessarily prevent plaintiffs from here proceeding against a different and additional defendant, namely against Les Servier.

In *Sunbeam Corporation v. Liberty Mutual Insurance Company, infra,* our Supreme Court has explained the doctrine of judicial estoppel.

"Judicial estoppel is an equitable, judicially-created doctrine designed to protect the integrity of the courts by preventing litigants from 'playing fast and loose' with the judicial system by adopting whatever position suits the moment. *Gross v. City of Pittsburgh,* 686 A.2d 864, 867 (Pa. Commw. 1966). Unlike collateral estoppel or res judicata, it does not depend on relationships between parties, but rather on the relationship of one party to one or more tribunals. In essence, the doctrine prohibits parties from switching legal positions to suit their own ends." *Sunbeam Corp. v. Liberty Mutual Insurance Co.,* 566 Pa. 494, 500, 781 A.2d 1189, 1192 (2001),

The Pennsylvania Supreme Court has ruled that "[w]e have a summary judgment rule in this Commonwealth in order to dispense with a trial of a case (or, in some matters, issues in a case), where a party lacks the begin-

nings of evidence to establish or contest a material issue." *Ertel v. Patriot-News Co.,* 544 Pa. 93, 100, 674 A.2d 1038, 1042 (1996). In Pennsylvania, "[i]t is by now axiomatic that a motion for summary judgment may only be granted where there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law." *Burnside v. Abbott Laboratories,* 351 Pa. Super. 264, 273-74, 505 A.2d 973, 978 (1985). Thus, Pennsylvania courts have ruled that "the function of a summary judgment motion is to avoid a useless trial." *Dillon by Dillon v. National Railroad Corp. (Amtrak),* 345 Pa. Super. 126, 137, 497 A.2d 1336, 1341 (1985). (citations omitted) In Pennsylvania, the principles governing summary judgment are well-settled: "First, the pleadings, depositions, answers to interrogatories, admissions on file, together with the affidavits, if any, must demonstrate that there exists no genuine triable issue of fact . . . Second, the record must show that the moving party is entitled to judgment as a matter of law." *Stidham v. Millvale Sportsmen's Club,* 421 Pa. Super. 548, 558, 618 A.2d 945, 950 (1992). (citations omitted) "It is not part of the court's function to decide issues of fact but solely to determine whether there is an issue of fact to be tried." *Washington Federal Savings & Loan Association v. Stein,* 357 Pa. Super. 286, 288, 515 A.2d 980, 981 (1986). "[A]ll doubts as to the existence of a genuine issue of material fact must be resolved against the party moving for summary judgment." *Breslin by Breslin v. Ridarelli,* 308 Pa. Super. 179, 183, 454 A.2d 80, 82 (1982). (citations omitted) "Summary judgment may be granted only where the right is clear and free from doubt." *First Wisconsin Trust Co. v. Strausser,* 439 Pa. Super.

192, 198, 653 A.2d 688, 691 (1995) (citing *Thompson Coal Co. v. Pike Coal Co.,* 488 Pa. 198, 412 A.2d 466 (1979)). "The moving party has the burden of proving that there is no genuine issue of material fact." *Id.,* 439 Pa. Super. at 198, 653 A.2d at 691. In determining whether the moving party has met this burden, the court must examine the record in the light most favorable to the non-moving party, giving that party the benefit of all reasonable inferences. See *Elder v. Nationwide Insurance Co.,* 410 Pa. Super. 290, 294, 599 A.2d 996, 998 (1991). Once a motion for summary judgment is made and properly supported, "a non-moving party may not avoid summary judgment by rest[ing] upon the mere allegations or denials of his pleading . . . ." *Ertel,* 544 Pa. at 100, 674 A.2d at 1042. Rather, the non-moving party must set forth specific facts showing that there is a genuine issue for trial. See *Curran v. Children's Service Center of Wyoming County Inc.,* 396 Pa. Super. 29, 33, 578 A.2d 8, 9 (1990). Thus, rearticulating the Pennsylvania Supreme Court's own well-settled ruling, the *Ertel* court ruled that in Pennsylvania "the mission of the summary judgment procedure is to pierce the pleadings and assess the proof in order to see whether there is a genuine need for a trial." *Ertel,* 544 Pa at 100, 674 A.2d at 1042. (citations omitted)

Considering the instant factual predicate, this court finds that the doctrine of judicial estoppel is applicable and that the granting of summary judgment is required and proper.

In their general master long-form complaint and jury demand, filed on May 17, 1999, under the mass tort protocols, plaintiffs alleged, inter alia, that Les Servier for-

mulated, developed, manufactured, promoted, marketed, licensed, distributed and/or sold pharmaceutical products most relevantly in Pennsylvania.

The complaint goes on to allege that such activity made Les Servier liable to plaintiffs under theories of negligence, strict liability, breach of implied warranty, breach of express warranty, fraud and loss of consortium, and it seeks compensatory and punitive damages.

Prior orders of court, issued pursuant to Les Servier's preliminary objections, struck plaintiffs' Counts II and III, alleging strict liability in tort and strict liability failure to warn, respectively, and Count IV, alleging breach of implied warranty. The remaining counts were resolved by the instant order granting defendant's motion for summary judgment.

Although this court's conclusion that the doctrine of judicial estoppel by itself warrants a grant of summary judgment on all counts, there are additional bases upon which summary judgment would be appropriate, which bases this court briefly analyzes in what follows.

In Count I (¶¶63-69) of their complaint, plaintiffs allege negligence against defendant Les Servier.

Plaintiffs' negligence count does not restrict its focus to the specific activity by Les Servier which is complained of. Indeed, the complaint goes on at length to list every possible activity which may be assumed to be inherent in any drug's coming to market. Because of this dissembling, the court will utilize a construct in analyzing plaintiff's allegations of negligence.

The Pennsylvania Supreme Court has articulated the elements a plaintiff must plead in advancing a count of

negligence: "(1) the existence of a duty or obligation recognized by law, requiring the actor to conform to a certain standard of conduct; (2) a failure on the part of the defendant to conform to that duty, or a breach thereof; (3) a causal connection between the defendant's breach and the resulting injury; and (4) actual loss or damage suffered by the complainant." *Atcovitz v. Gulph Mills Tennis Club Inc.*, 2002 WL 31867709, *2 (Pa.)

Assuming that, in the instant matter, the complained of activity comprises the designing, manufacturing, selling, distributing, promoting, testing, etc., of the finished diet drug product, the record contains no evidence to corroborate the claim that Les Servier was involved in any of those activities. As Les Servier amply points out in its merits motion (global motion for summary judgment, merits motion, at 19-21), the AHP defendants have admitted that they exclusively performed all the complained of activities. Further, as identified above, plaintiffs themselves have alleged in another forum that parties other than Les Servier defendants had been exclusively responsible for the complained of activities. The same plaintiffs have also benefited from this position by virtue of the above referred to class action certification and settlement.

Under the comprehensive Food and Drug Administration regulatory scheme (FDA Act), a manufacturer must obtain approval from the FDA agency to distribute its product, Food, Drug and Cosmetic Act, 21 U.S.C. §301 et seq. Said approval is secured by formal application, which must include "full reports of investigation which have been made to show whether or not such drug is safe for use and whether such drug is effective in use."

21 U.S.C. §355(b)(1)(A). Additionally, subsequent to FDA approval, a manufacturer is required to provide updated data or information to the FDA secretary, to enable the secretary to determine whether grounds exist for revocation of the drug, 21 U.S.C. §355 (k)(1). Moreover, the manufacturer, distributor or seller of the drug has the duty to label the prescription drug it has manufactured. See 21 U.S.C. §352(b), 21 C.F.R. §201.100.

It is clear that a determination of manufacturers, distributors or sellers status is critical under the FDA regulatory scheme, not just for the initial approval of the drug, but also for the continuing monitoring of the safety and efficaciousness of the drug. Once AHP has been determined to be the exclusive manufacturer, distributor, and seller of the drug here at issue, it follows a priori that Les Servier cannot be identified as a manufacturer, distributor, or seller of the drug here at issue, and that it must be precluded from the class of companies to be held liable for said manufacturing, distribution or sale of the drug.

"Proof of causation is a necessary element in a products liability action as well as in a negligence action. 'A plaintiff must establish that a particular product of a defendant manufacturer caused her injuries.' *City of Philadelphia v. Lead Industries Asso.,* 994 F.2d 112, 123 (3d Cir. 1993), citing *Lilley v. Johns-Manville,* 408 Pa. Super. 83, 92, 596 A.2d 203, 207 (1991), *alloc. denied,* 530 Pa. 644, 607 A.2d 254 (1992); *Eckenrod v. GAF Corp.,* 375 Pa. Super. 187, 190-91, 544 A.2d 50, 52 (1988), *alloc. denied,* 520 Pa. 605, 553 A.2d 968 (1988). In general, a defendant must be identified as the manufacturer, distributor, or seller of the offending product before the in-

juries suffered by the plaintiff may be found to be proximately caused by some negligent act or omission of the defendant. 'Absent such identification, there can be no allegations of duty, breach of duty, or legal causation, and hence there can be no liability.' *Id.,* 344 Pa. Super. at 18, 495 A.2d at 967-68." *Mellon v. Barre-National Drug Co.,* 431 Pa. Super. 175, 184, 636 A.2d 187, 191-92 (1993).

Since plaintiffs have failed to establish that the Les Servier defendants engaged in the complained of conduct, it follows that Les Servier had no duty. Without such duty being established, liability deriving from a theory of negligence cannot be attached.

Assuming again that plaintiffs' theory against Les Servier under the negligence count is based upon a failure to warn, plaintiffs must establish that Les Servier had some duty to them as a consumer of the final product.

It has been here established peradventure that Les Servier did none of the activities of a manufacturer, distributor or seller of the final product, although it did manufacture an ingredient in bulk, which AHP then used in its final manufacture of the product.

In *White v. Weiner,* our Superior Court had before it a case which is a factual replica of the instant case. See *White v. Weiner,* 386 Pa. Super. 111, 562 A.2d 378 (1989). The *White* case involved the sale in bulk quantity of the drug protamine sulfate. This protamine sulfate, *"in bulk packages not in tablet, capsule or dosage form" id.* at 115, 562 A.2d at 380 (emphasis added), was sold to the pharmaceutical company Upjohn for conversion to a final product, which would then be distributed to medical care providers for prescription to the individual parties.

238

The court, in *White,* reviewed the FDA Act and the Pennsylvania Controlled Substance, Drug, Device and Cosmetic Act, 35 P.S. §780-101 to §780-144, (Commonwealth Act), and found that, for the purpose of applying a labeling requirement, 21 U.S.C. §§301-392 (1982), the "Federal Act," did not preempt the "Commonwealth Act." "It is axiomatic that the existence of a federal statute, such as that governing the manufacture, distribution, and sale of prescription drugs . . . does not necessarily preempt state action in that field." *White,* 386 Pa. Super. at 117, 562 A.2d at 381-82. (citations omitted) (footnote omitted) "[O]ur Supreme Court specifically concluded that the Federal Act did not preempt this Commonwealth's Dangerous Drug Act of 1955, a predecessor statute to the current Commonwealth Act." *Id.* at 117-18, 562 A.2d at 382. (footnote omitted)

"An examination of the federal statute reveals neither an express or [sic] implicit exposition of any congressional intent to preclude state action in the field of regulation of the sale and dispensing of drugs; there is, within the statute, 'no scheme of regulation' so 'pervasive' as to lead to the inference that the federal government by the passage of this legislation intended to pre-empt the field. The mere fact that Congress has taken action in this field does not justify the assumption that the federal system was thus intended to dominate that field. . . . Hence, because the field of drug regulation is not exclusively within the federal domain, this Commonwealth may enter that field so long as its laws and regulations do not conflict with the federal provisions." *Id.* at 118, 562 A.2d at 382. (citations omitted)

Nevertheless, the *White* court held that "[o]ur legislature unequivocally has expressed a policy of deference

to the federal scheme in the area of drug labeling, . . . ." *Id.* at 120, 562 A.2d at 383. Specifically, under the Federal Act, the labeling must include the following information: "description, clinical pharmacology, indications and usage, contraindications, warnings, precautions, adverse reactions, drug abuse and dependence, overdosage, dosage and administration, how supplied." *Id.* at 122, 562 A.2d at 384 (quoting 21 C.F.R. §201.56). In *White,* the court was clear in placing responsibility and, a fortiori, liability for the labeling requirements "squarely upon the shoulders" of the manufacturer, distributor or packer of the prescribed drug. See *id.* at 121, 562 A.2d at 384. The analysis of the *White* court then continued on to review the additional requirements imposed upon the manufacturer, distributor, etc. (See the above analysis under the general negligence discussion, p. 7 ff.)

With this analysis in hand, the *White* court held:

"In this case, we decline to impose on a bulk supplier of pharmaceutical chemicals the additional duties to warn suggested by appellant. The rigorous testing and reporting required of final manufacturers by federal law, see *e.g.,* 21 U.S.C. §355(b)(1)(A), (k)(1), renders superfluous detailed warning by bulk suppliers to those same manufacturers." *Id.* at 124, 562 A.2d at 385.

By way of partial explanation of its rationale for limiting the liability of a "bulk supplier," the *White* court wrote further,

"This general reluctance to expand tort liability within the distribution chain is consistent with our position that

"[i]t is illusory to believe the public does not pay for tort recoveries, or that resources for such are limitless.

As it is with everything, a balance must be struck—certain limits drawn . . . A sound and viable tort system—generally what we now have—is a valuable incident of our free society, but we must protect it from excess lest it becomes unworkable [citing] *Steiner v. Bell Telephone Co.,* 358 Pa. Super. 505, 522, 517 A.2d 1348, 1357 (1986) (en banc), *aff'd without opinion,* 518 Pa. 57, 540 A.2d 266 (1988)." *Id.* at 123-24, 562 A.2d at 385.

As a matter of law, Les Servier had not the duty to warn plaintiff consumers of Phen-Fen. Absent that duty, no liability for any failure to warn can exist.

As a discrete sub-issue of the general negligence count, plaintiff claims that defendant negligently designed the drugs in question. It remains clear that Les Servier did not manufacture the finished product, but only supplied a bulk ingredient which other companies converted into the final product of Phen-Fen; and, on that fact alone, the necessary nexus to the final product is absent.

An analysis of the *Incollingo, Baldino,* and *Hahn* line of cases is irrelevant here as those cases analyzed the duties of a manufacturer of the finished prescription drug. But cf. *Incollingo v. Ewing,* 444 Pa. 299, 282 A.2d 206 (1971); and cf. *Baldino v. Castagna,* 505 Pa. 239, 478 A.2d 807 (1984); and cf. *Hahn v. Richter,* 427 Pa. Super. 130, 628 A.2d 860 (1993). The duties of the Les Servier defendant fall rather within the *White v. Weiner* analysis herein presented.

In Count V of their complaint, plaintiffs allege a breach of express warranty against defendants, claiming that defendants expressly warranted that their products were both efficacious and safe for their intended use.

To defeat summary judgment on a claim of breach of express warranty, plaintiffs must first establish that an express warranty existed. Yet, in this action, plaintiffs fail to establish the existence of an express warranty. According to Pennsylvania law, an express warranty is created as follows:

"(a) General rule.—Express warranties by the seller are created as follows:

"(1) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

"(2) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

"(3) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

"(b) Formal words or specific intent unnecessary.—It is not necessary to the creation of an express warranty that the seller use formal words, such as 'warrant' or 'guarantee' or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the opinion of the seller or commendation of the goods does not create a warranty." 13 Pa.C.S. §2313.

To substantiate their claim of breach of warranty, plaintiffs offer several communications between defendants Servier and Wyeth concerning the collaboration between the companies with respect to fenfluramine and

dexfenfluramine. One example is a letter dated July 15, 1996, from Marie-Anne Attal of Les Servier to Matthew S. Dean of Wyeth that states that "[w]e are very proud of the U.S. introduction of Redux and of our collaboration." (Pl's exhibit V.) This "collaboration" represents nothing more nefarious than the commonplace relationship between bulk supplier and vendor. Another communication upon which the plaintiffs rely is a 1992 letter from Dr. Derome-Trombley to Dr. Boni of Interneuron that states that "[t]hese two drugs [dexfenfluramine and fenfluramine] are marketed worldwide by Servier." (Pl's exhibit O.)

While Les Servier may have marketed these component ingredients of Redux and Pondimin, there is no evidence that they made an affirmative promise regarding the safety of these drugs. As suppliers of ingredients in bulk form, it was not Les Servier's role or obligation to warrant their product to those who would eventually use Phen-Fen. Plaintiffs fail to offer any evidence of any actual, specific promise made by Les Servier to the parties injured by ingesting Phen-Fen. In accordance with prior decisions made in Pennsylvania, privity does not exist between bulk suppliers of a component ingredient in a compound and a party injured from ingesting the compound. See *White v. Weiner,* 386 Pa. Super. 111, 562 A.2d 378 (1989). Likewise, this causal leap cannot be made when transposing responsibility for express warranties from Wyeth, who may have made these warranties, to Les Servier, who merely supplied the component bulk ingredients.

Because plaintiff's brief is totally devoid of any evidence of an express warranty made by Les Servier, summary judgment is appropriate with regard to this count.

In Count VI of their complaint, plaintiffs allege that Les Servier made fraudulent misrepresentations in advertising and in promoting their drugs.

The record before this court contains no evidence to support the allegation of fraud, since there is no evidence in the record that defendants made any representations at all to the injured patients about the safety of "Phen-Fen." Consequently, the allegation of fraud could never withstand the rigorous scrutiny required of an allegation of fraud.

The Pennsylvania Supreme Court has ruled that "fraud or intent to defraud is never presumed, and must be proved by 'evidence that is clear, precise and convincing.'" *Snell v. Commonwealth of Pennsylvania, State Examining Board,* 490 Pa. 277, 281, 416 A.2d 468, 470 (1980). (citations omitted) Specifically, the Pennsylvania Superior Court has determined that "[f]raud consists of anything calculated to deceive, whether by single act or combination, or by suppression of truth, or suggestion of what is false, whether it be by direct . . . innuendo, by speech or silence, word of mouth, or look or gesture." *Delahanty v. First Pennsylvania Bank N.A.,* 318 Pa. Super. 90, 107, 464 A.2d 1243, 1251 (1983) (citing *Frowen v. Blank,* 493 Pa. 137, 425 A.2d 412 (1981)). The *Delahanty* court articulated the long-settled elements a party must prove to succeed on a cause of action for fraud. "The elements of fraud are as follows: 'there must be (1) a misrepresentation, (2) a fraudulent utterance thereof, (3) an intention by the maker that the recipient will thereby be induced to act, (4) justifiable reliance by the recipient upon the misrepresentation, and (5) dam-

age to the recipient as the proximate result.' " *Id.* at 108, 464 A.2d at 1252. (citations omitted)

In this matter, this court has ruled that plaintiffs' claims that Les Servier was anything more than a bulk supplier of the powdered ingredient in Pondimin and in Redux lack all factual support. As manufacturers of a mere ingredient but not the final product, defendants in this present action lacked a duty to the plaintiffs. Furthermore, plaintiffs could not have acted in justifiable reliance on statements of misrepresentation allegedly made by defendants, and plaintiffs did not so act, because defendants never made such statements. Therefore, plaintiffs have failed to prove all the elements necessary to sustain their claim of fraud.

For the above reasons, this court properly granted defendant's motion for summary judgment and committed no error of law thereby.